REVISED JUNE 9, 1999

IN THE UNITED STATES COURT OF APPEALS

FOR THE FIFTH CIRCUIT

_____

No. 97-60687
_____

SAMUEL RICE JOHNSON,

Petitioner-Appellant,

v.

STEVE PUCKETT, Commissioner; JAMES V ANDERSON, SUPERINTENDENT,
MISSISSIPPI STATE PENITENTIARY; STATE OF MISSISSIPPI,

Respondents-Appellees.

_____

Appeal from the United States District Court
for the Southern District of Mississippi
_____

May 20, 1999

Before KING, Chief Judge, and POLITZ and BENAVIDES, Circuit
Judges.

KING, Chief Judge:

Samuel Johnson appeals the district court's denial of his
habeas corpus application. Johnson challenges his continued
confinement on several grounds, but his chief complaint is that
the state failed to disclose exculpatory material and suborned
perjury in violation of Brady v. Maryland, 373 U.S. 83 (1963),
and Giglio v. United States, 405 U.S. 150 (1972). Because we
conclude the district court correctly denied relief on this and
all of Johnson's other assignments of error, we affirm.

I. FACTUAL AND PROCEDURAL BACKGROUND

On December 31, 1981, Mississippi Highway Patrol Officer Billy Langham stopped a car driven by Samuel Johnson containing three passengers (Anthony Fields, Otis Fairley, and Charles Montgomery, Jr.) as it traveled north on Highway 49 approaching Collins, Mississippi. Langham asked to see Johnson's license, and Johnson informed the officer that he did not have one. Langham asked the occupants of the car to exit the vehicle, and they complied with his request.

As the magistrate judge noted in his report in which he recommended that the district court deny Johnson habeas relief, "[t]here is a great deal of conflicting testimony as to what transpired next and as to 'who did what.'" Ultimately, Officer Langham was killed after being stabbed with a butcher knife in the back between his shoulder blades and being shot at close range with his own revolver. Johnson, Fairley, and Montgomery were indicted for capital murder. Fairley and Montgomery were convicted and each given a life sentence. Fields, in contrast, pleaded guilty to accessory after the fact and was sentenced to a five-year term of imprisonment.

Both Fairley and Fields testified at Johnson's trial. Johnson called Fairley as his primary witness, and Fairley testified that Fields stabbed and shot Langham. Fields was called as a witness by the state and testified that Langham was stabbed by Johnson and shot by Montgomery. Johnson did not testify in his own defense.

2

On September 3, 1982, Johnson was convicted of Officer Langham's murder and sentenced to death.  On direct appeal, the Supreme Court of Mississippi affirmed his conviction and sentence.  See Johnson v. State, 477 So. 2d 196 (Miss. 1985).  On May 6, 1986, the United States Supreme Court denied Johnson's petition for writ of certiorari.  See Johnson v. Mississippi, 476 U.S. 1109 (1986).

Johnson then filed a motion for post-conviction relief in Mississippi state court.  In that motion, Johnson argued, inter alia, that post-conviction relief was justified based on the fact that a 1963 felony assault conviction in New York, which was one of three aggravating circumstances that elevated Johnson's crime from murder to capital murder, had been set aside by the New York courts.  See People v. Johnson, 506 N.E.2d 1177 (N.Y. 1987).  The Mississippi Supreme Court, by a vote of 6-3, denied Johnson's application for post-conviction relief.  See Johnson v. State, 511 So. 2d 1333 (Miss. 1987).

Johnson then filed a petition for writ of certiorari with the United States Supreme Court, which the Court granted on January 11, 1988.  See Johnson v. Mississippi, 484 U.S. 1003 (1988).  The Supreme Court vacated Johnson's death sentence, ruling that, in the context of the Mississippi sentencing scheme, the Eighth Amendment requires re-examination of a death sentence based in part on a prior felony conviction which was set aside in the rendering state after the capital sentence was imposed.

3

See Johnson v. Mississippi, 486 U.S. 578, 584-90 (1988). On remand, the Mississippi Supreme Court reconsidered Johnson's motion for post-conviction relief and remanded to the trial court for re-sentencing. See Johnson v. State, 547 So. 2d 59 (Miss. 1989) (en banc). The trial court subsequently re-sentenced Johnson to life in prison.

On June 6, 1994, Johnson filed a second motion for post-conviction relief with the Mississippi Supreme Court, in which he alleged that his conviction was flawed because it was based on the perjured testimony of a co-indictee, Fields, and because the prosecution failed to disclose certain evidence to which Johnson claimed he did not have access until his re-sentencing hearing. The Mississippi Supreme Court denied relief, finding that his petition was barred: (1) by the applicable three-year statute of limitations, (2) as a second, successive application for post-conviction relief, and (3) by the doctrine of res judicata. See Johnson v. State, No. 94-DP-00532-SCT (Miss. June 8, 1995).

On April 23, 1996, Johnson filed an application for writ of habeas corpus in the United States District Court for the Southern District of Mississippi. A magistrate judge conducted an evidentiary hearing on April 22, 1997, limited to the presentation of proof in support of Johnson's claim that newly discovered evidence was not reasonably available to Johnson at the time of his trial. The magistrate judge issued a report recommending that Johnson's habeas application be dismissed with

4

prejudice.  The district court adopted the magistrate's report on September 25, 1997, denying Johnson relief.  The district court construed Johnson's timely notice of appeal as a request for a certificate of probable cause (CPC), and granted Johnson a CPC to appeal the denial of habeas relief to this court.

## II.  DISCUSSION

We review the district court's findings of fact for clear error and its conclusions of law de novo.  See Gochicoa v. Johnson, 118 F.3d 440, 444 (5th Cir. 1997), cert. denied, 118 S. Ct. 1063 (1998); Spence v. Johnson, 80 F.3d 989, 993 (5th Cir. 1996).  Because Johnson filed his federal habeas application in district court prior to April 24, 1996, the date Congress enacted the Anti-Terrorism and Effective Death Penalty Act of 1996 (AEDPA), we must apply pre-AEDPA deference standards to any state court determinations.  See Gochicoa, 118 F.3d at 444-45.  Under pre-AEDPA law, state court findings of fact are entitled to a presumption of correctness, see Boyle v. Johnson, 93 F.3d 180, 186 (5th Cir. 1996), and we review state determinations of law and mixed questions of law and fact de novo, see Gochicoa, 118 F.3d at 444; Amos v. Scott, 61 F.3d 333, 337-38 (5th Cir. 1995).

Johnson raised twenty-eight grounds in his habeas corpus application in the district court.  He briefs six of these issues on appeal, and we consider the remainder abandoned.  See Trevino v. Johnson, 168 F.3d 173, 181 n.3 (5th Cir. 1999); Yohey v. Collins, 985 F.2d 222, 225 (5th Cir. 1993).  In addition, Johnson

5

argues for the first time on appeal that collateral relief is warranted on the basis of the cumulative effect of errors committed by the state trial court. "We have repeatedly held that a contention not raised by a habeas petitioner in the district court cannot be considered for the first time on appeal from that court's denial of habeas relief." Johnson v. Puckett, 930 F.2d 445, 448 (5th Cir. 1991). We therefore limit our attention to the six issues Johnson argued to the district court and now advances on appeal. We address these issues in turn.

## A. **Brady**/**Giglio** Claim

Johnson bases his first claim of error on Brady v. Maryland, 373 U.S. 83 (1963), and Giglio v. United States, 405 U.S. 150 (1972). The district court concluded that this claim was procedurally barred, a legal conclusion that we review de novo. See Martin v. Maxey, 98 F.3d 844, 847 (5th Cir. 1996); Amos, 61 F.3d at 338.

Johnson maintains that the state withheld exculpatory evidence, including details concerning benefits that Fields, the state's chief witness, received from the state as a result of testifying against Johnson.[1] Further, Johnson maintains that the

---

[1] According to Johnson, Fields's cooperation led to him becoming a "key man" in jail, which allowed him "to go home, walk to the bank to do his business, go to the local store to buy food and cigarettes, cook up whatever burgers he might buy, and even get drinks in the jail." In addition, Johnson contends that the state promised Fields help in obtaining parole. Johnson also claims that the state failed to reveal racial epithets and threats purportedly made to Fields while he was in jail before he

state suborned perjury because prosecutors knew or should have known that Fields lied during his testimony. Specifically, in his habeas application submitted to the district court, Johnson identifies several areas of Fields's testimony in which he argues that the state knew or should have known that Fields lied: whether Fields previously had been convicted of a crime; whether Fields, Johnson, Montgomery, and Fairley had stopped in Purvis, Texas before they were stopped by Officer Langham; when and where Fields first saw the knife that was eventually used in stabbing Officer Langham; whether Johnson was wearing a coat during the assault of the officer; the number of times Fields spoke to authorities before testifying in Johnson's trial; and, most importantly, who killed Officer Langham.

Johnson presented a similar claim in his first state motion for collateral relief. In that motion, Johnson argued that the state failed to disclose Fields's criminal record and inculpatory statements made by Fields in violation of Brady, and that the state failed to correct Fields's testimony concerning his prior criminal record that it knew was perjured, necessitating relief under Giglio. Johnson had not briefed either issue in his direct appeal before the Mississippi Supreme Court, and neither argument

_____

testified in Johnson's trial. Johnson argues that these threats provided an incentive for Fields to testify favorably for the state.

7

addressed the alleged deal Fields and prosecutors entered into as a result of Fields's testifying against Johnson.

It is clear from the opinion rendered by the Mississippi Supreme Court denying Johnson's first motion for post-conviction relief that that court declined to address the merits of these claims because it found them to be procedurally barred. See Johnson, 511 So. 2d at 1335-36, 1342. However, it is more difficult to discern which bar the court applied in denying relief. The court states that Johnson waived the Brady claim, because Johnson "failed to raise [the issue] at trial or on the direct appeal." Id. at 1342. However, the court concluded that the Giglio claim was procedurally barred by the doctrine of res judicata because it was "considered and addressed by us on the direct appeal." Id.

In Johnson's second motion for post-conviction relief, he argued that the prosecution's failure to disclose the details of the benefits Fields received after testifying for the state violated Brady, and that "the government knew, or should have known, that Fields was committing perjury in denying the full scope of his deal, and in making inconsistent statements at Petitioner's trial," in violation of Giglio.[2]

_____

[2] Johnson did not identify the statements he believed were "inconsistent" other than those related to the purported deal between Fields and the prosecution, and it is therefore impossible to determine the extent of the overlap between Johnson's argument in his second motion for post-conviction relief and his Giglio argument in his first motion for post-

8

The Mississippi Supreme Court again relied on procedural bars in denying Johnson's second motion for post-conviction relief. The court found that Johnson was barred: first, by the applicable three-year statute of limitations; second, as a second and successive application of post-conviction relief; and third, by the doctrine of res judicata. The court therefore declined to address these issues on the merits in denying Johnson collateral relief.

Johnson admits in his brief to this court that he "was subjected to a procedural bar in state court" on his Brady/Giglio claim, and, during oral argument, Johnson's counsel explicitly asserted that the procedural bars enforced by the Mississippi Supreme Court in its opinion denying relief on Johnson's second motion for post-conviction relief apply to this claim.[3] Johnson's argument on appeal thus is not that the district court incorrectly concluded that the Mississippi Supreme Court applied a procedural bar to this claim;[4] instead, he argues that the

conviction relief.

[3] We note that the Mississippi Supreme Court's explicit reliance on the three-year time limitation of MISS. CODE ANN. § 99-39-5(2) in its denial of Johnson's second collateral motion is an independent and adequate state ground that bars this court from considering the merits of the claim, subject to the normal exceptions to the procedural bar doctrine. See Lott v. Hargett, 80 F.3d 161, 165 (5th Cir. 1996) (stating that Mississippi courts consistently and regularly apply § 99-39-5(2)).

[4] Johnson does disagree with the district court's apparent conclusion that the procedural bars from his first motion for post-conviction relief apply to this claim. This is of no

9

district court erred in concluding that he had failed to show sufficient cause and prejudice to overcome the procedural bar applied by the Mississippi Supreme Court.

Federal review of a procedurally defaulted claim is precluded unless "the prisoner can demonstrate cause for the default and actual prejudice as a result of the alleged violation of federal law, or demonstrate that failure to consider the claims will result in a fundamental miscarriage of justice." Coleman v. Thompson, 501 U.S. 722, 750 (1991). To establish cause for a procedural default, there "must be something external to the petitioner, something that cannot fairly be attributed to him." Id. at 753. Johnson maintains that he has met this burden; he argues that the evidence adduced at the evidentiary hearing conducted by the magistrate judge proves that the state interfered with his access to Fields, the state's primary witness, thereby limiting his ability to discover the full

---

import, as he admits that the Mississippi Supreme Court applied a procedural bar to the issue he raises on appeal. We note that the question of which procedural bar applies is more simple on appeal than it was before the district court; Johnson's Brady/Giglio argument to the district court was apparently based on more material and testimony than is the subject of this appeal, and at least some of that material and testimony was the subject of Johnson's first post-conviction relief motion. We are convinced after reading Johnson's appellate brief and hearing his oral argument to this court that the issue before us, which is primarily based on alleged threats made to Fields and the scope of a purported deal between Fields and the state, was denied as procedurally barred in Johnson's second motion for collateral relief.

10

ramifications of Fields's plea bargain with the state and the extent of his preferential treatment by authorities.

While we agree with Johnson that a showing of "interference by officials" is sufficient to show cause for a procedural default, McCleskey v. Zant, 499 U.S. 467, 494 (1991) (internal quotation marks omitted), we are unpersuaded by Johnson's contention that he has made such a showing. In support of his claim, Johnson argues that he presented unrebutted testimony at the evidentiary hearing that Fields refused to talk to anyone on the defense team until October 10, 1991. However, even if this contention were true, Johnson has not established that the cause of Fields's refusal to speak with Johnson's attorneys was interference by state law enforcement. Fields may have made a personal choice to avoid such contact--a choice that is well within his rights. See United States v. Soape, 169 F.3d 257, 271 n.9 (5th Cir. 1999) ("[A] government witness who does not wish to speak to or be interviewed by the defense prior to trial may not be required to do so.") (internal quotation marks omitted); United States v. Caldwell, 750 F.2d 341, 347 (5th Cir. 1984) (noting that a defendant's right to access to a witness "exists co-equally with the witness' right to refuse to say anything") (internal quotation marks omitted).

Johnson asserts, however, that Fields's silence was not the product of Fields's own volition. Rather, Johnson maintains that Fields was "discouraged" from speaking with the defense by a

11

local law enforcement officer, who, according to Johnson, told "defense counsel that Fields could only speak to the defense in the presence of [then-]District Attorney Bob Evans." However, there is no evidence to support this assertion in the record. On the contrary, during the evidentiary hearing conducted by the magistrate, Fields testified on direct examination as follows:

> Q. Do you recall Sheriff Lloyd Jones telling you that you weren't allowed to talk to us without [then-District Attorney] Bob Evans being present? Do you recall that?
> A. No, I don't.

After Fields denied that Sheriff Jones interfered with Johnson's counsel's access to him, Johnson's counsel elicited the following cross-examination testimony from Marvin White, who had served as special prosecutor during Johnson's re-sentencing proceedings:

> Q. Do you also recall that prior to the 1992 [re-sentencing] trial we litigated the question of defense access to Anthony Fields? Do you recall that?
> A. That's correct.
> Q. Do you recall that we were being told by Sheriff Lloyd Jones we couldn't talk to him. Right?
> A. No, I don't think so.
> Q. What do you recall us litigating?
> A. I think that you asked for access to him and he asked for counsel and we litigated that, and Rex Jones represented him. You wanted access not only to Anthony Fields but also to his counsel, and the court ruled that you could not have -- Anthony Fields could talk to you if he wanted to and that Rex Jones did not have to because he had the right of privilege. Anthony Fields did not have to talk to you if he chose not to and he chose not to.
> Q. Do you recall us filing a motion saying that on July 15th, 1990, Sheriff Jones told my two investigators they could only talk with Anthony Fields if Bob Evans was present? Do you recall that?

12

        A.   Yeah, you may have.
        Q.   And the record would best reflect --
        A.   The record certainly reflects that.  Of course, you
        haven't made that record part of this proceeding.

Curiously, although Judge Robert Evans, who was the presiding District Attorney at the time of Johnson's original trial, was called by the state to testify at the evidentiary hearing, Johnson's counsel chose not to question him regarding any official interference with Johnson's access to Fields.  Thus, no evidence presented during the evidentiary hearing, and no evidence in the entire record before this court, supports Johnson's contention that state officials made "compliance with the procedural rule impracticable."  United States v. Guerra, 94 F.3d 989, 993 (5th Cir. 1996).  We therefore have no trouble concluding that the district court properly found that Johnson failed in his burden to establish cause for his procedural default, and we need not consider whether there is actual prejudice.  See Saahir v. Collins, 956 F.2d 115, 118 (5th Cir. 1992).[5]

## B.  Accessory-After-the-Fact Instruction

Johnson next argues that the trial court's refusal to instruct the jury on the crime of accessory after the fact violated his constitutional rights.  Johnson contends that the

---

[5] In his brief, Johnson does not discuss nor oppose the district court's well-reasoned finding that failure to consider this claim will not result in a fundamental miscarriage of justice.

13

court's ruling prevented him from presenting his theory of the case to the jury, namely, that he did not commit the murder of Officer Langham, and that his only offense was driving the get-away car after the killing.

The Mississippi Supreme Court rejected this claim in Johnson's direct appeal. Relying on Wilcher v. State, 455 So. 2d 727 (Miss. 1984) (en banc), vacated in part on other grounds, 635 So. 2d 789 (Miss. 1993), in which the court held that accessory after the fact is not a lesser included offense of capital murder, the court ruled that a defendant is not entitled "to have the jury separately instructed and separately . . . consider whether [Johnson] was guilty of being an accessory after the fact." Johnson, 477 So. 2d at 214-15. The district court refused to grant Johnson habeas relief on this issue, ruling that Johnson was not entitled to an instruction for accessory after the fact because that offense is not a lesser included offense of capital murder, and concluding that, in any event, "the evidence in this case does not support a conviction for accessory-after-the-fact and, hence, it was certainly not error for the trial court to refuse such an instruction."

Johnson makes two interrelated arguments with respect to this issue. First, Johnson argues that under Beck v. Alabama, 447 U.S. 625 (1980), the trial court was constitutionally required to give the requested instruction. Johnson's reliance on Beck is misplaced. In that case, the Supreme Court concluded

14

that Alabama's "all-or-nothing" death penalty statute, which

forbade trial courts from issuing lesser-included-offense

instructions in capital cases, was constitutionally deficient.

See id. at 627. As the Supreme Court explained in Schad v.

Arizona, 501 U.S. 624, 646 (1991), the

> fundamental concern in Beck was that a jury convinced
> that the defendant had committed some violent crime but
> not convinced that he was guilty of a capital crime
> might nonetheless vote for a capital conviction if the
> only alternative was to set the defendant free with no
> punishment at all.

Thus, "Beck addresses only those cases in which the jury is faced

with an 'all-or-nothing' decision." Allridge v. Scott, 41 F.3d

213, 219 (5th Cir. 1994). Here, despite the fact that the trial

judge refused to give an instruction on accessory after the fact,

the jury was not presented with a choice between returning a

guilty verdict on a capital offense or setting Johnson free. The

instruction that the jury in this case received on capital murder

stated:

> If you find the State has failed to prove any one of
> the essential elements of the crime of capital murder,
> you must find the defendant not guilty of capital
> murder and you will proceed with your deliberations to
> decide whether the State has proved beyond a reasonable
> doubt all the elements of the lesser crime of murder
> less than capital.

Johnson, 477 So. 2d at 212. The jury instruction then set forth

the elements of the crimes of murder and manslaughter, and

instructed the jury that if it found that Johnson had completed

the requisite acts to be guilty of one of these crimes, but not

15

of capital murder, it was to return a verdict of guilty to one of

the lesser crimes.  Thus, the harm identified in Beck, that a

jury might be pressured or coerced into returning a guilty

verdict on a capital crime in order to avoid setting the

defendant free, is not present in this case.[6]  See Schad, 501

U.S. at 647 ("This central concern of Beck simply is not

implicated in the present case, for petitioner's jury was not

faced with an all-or-nothing choice between the offense of

conviction (capital murder) and innocence."); Allridge, 41 F.3d

at 220 ("But if the jury is given a third instruction,

particularly one that is supported by the evidence, then due

process is no longer implicated.").

Johnson further contends that the distinction between lesser

included offenses of capital murder, such as murder and

manslaughter, and lesser related offenses, such as accessory

after the fact, is "spurious," and that the trial court was

constitutionally required to instruct the jury on his theory of

the case, that he had committed a lesser related offense, but had

_____

[6] Because we decide that Beck does not apply to the factual
circumstances of this case, we need not consider the application
of our recent conclusion in Creel v. Johnson, 162 F.3d 385, 390-
91 (5th Cir. 1998), petition for cert. filed, (U.S. Mar. 23,
1999) (No. 98-8720), that "a case in which the death penalty is
sought but not imposed ultimately is classified as a noncapital
case for the purposes of a Beck analysis."  In this case, as we
discussed supra, Johnson was originally sentenced to death, but
then re-sentenced by a different jury to life in prison after the
Supreme Court vacated his sentence.

16

not committed capital murder.  We reject Johnson's suggestion that any such requirement is mandated by the Constitution.

In Hopkins v. Reeves, 118 S. Ct. 1895, 1897-98 (1998), the Supreme Court considered "whether Beck requires state trial courts to instruct juries on offenses that are not lesser included offenses of the charged crime under State law," and concluded that "such instructions are not constitutionally required."  The Court in that case considered the claims of a habeas petitioner who had been convicted of felony murder in Nebraska state court.  See id. at 1898.  The petitioner claimed that the trial court's refusal to issue instructions on murder in the second degree and manslaughter, which, under Nebraska state law, were not lesser included offenses of felony murder, necessitated collateral relief.  The situation that the Court faced in Hopkins was unquestionably more difficult than the instant case; the jury in Hopkins was given an all-or-nothing choice between conviction or setting the defendant free, as Nebraska law recognized no lesser included offenses of felony murder.  Even so, the Court rejected the petitioner's constitutional challenge on the merits, stating:

> The Court of Appeals [which had granted habeas relief] in this case . . . required in effect that States create lesser included offenses to all capital crimes, by requiring that an instruction be given on some other offense--what could be called a "lesser related offense"--when no lesser included offense exists.  Such a requirement is not only unprecedented, but also unworkable. . . . The Court of Appeals apparently would recognize a constitutional right to an instruction on

17

> any offense that bears a resemblance to the charged
> crime and is supported by the evidence.  Such an
> affirmative obligation is unquestionably a greater
> limitation on a State's prerogative to structure its
> criminal law than is Beck's rule that a State may not
> erect a capital-specific, artificial barrier to the
> provision of instructions on offenses that actually are
> lesser included offenses under state law.

Id. at 1901.  Likewise, under Mississippi law, accessory after the fact is not a lesser included offense of capital murder. See Wilcher, 455 So. 2d at 734.  The trial court's refusal to grant an instruction on accessory after the fact was therefore not a violation of Johnson's constitutional rights.  See Hopkins, 118 S. Ct. at 1901.

It is irrelevant that, subsequent to Johnson's conviction, the Mississippi Supreme Court has determined that a defendant has a right under state law to an instruction on "a lesser crime which could be found to have been committed on the evidence before the jury."  Toliver v. State, 600 So. 2d 186, 192 (Miss. 1992) (Banks, J., concurring); see Gangl v. State, 539 So. 2d 132, 135 (Miss. 1989) (en banc) ("The better rule in cases such as this is that the defendant may request an instruction regarding any offense carrying a lesser punishment if the lesser offense arises out of a nucleus of operative fact common with the factual scenario giving rise to the charge laid out in the indictment.").  First, the Supreme Court made clear in Hopkins that any such right does not arise under the federal Constitution.  See 118 S. Ct. at 1901 (stating that "[w]e have

18

never suggested that the Constitution requires anything more" than an instruction on lesser included offenses in capital trials); see also Greenawalt v. Ricketts, 943 F.2d 1020, 1029 (9th Cir. 1991) (denying relief on habeas petitioner's claim based on trial court's refusal to grant instruction on lesser related, but not lesser included, offense). In habeas review, we limit the issuance of the writ to those cases where there have been federal constitutional violations. See Castillo v. Johnson, 141 F.3d 218, 223 (5th Cir. 1998); Mayo v. Lynaugh, 882 F.2d 134, 137 (5th Cir. 1989). Second, as our discussion of Beck and Hopkins makes clear, the rule Johnson advocates was not "dictated by precedent" in 1986, when Johnson's conviction became final. Teague v. Lane, 489 U.S. 288, 301 (1989). We are therefore prohibited from creating or applying such a rule on habeas review under the Teague anti-retroactivity doctrine. See id.; Vega v. Johnson, 149 F.3d 354, 357 (5th Cir. 1998), cert. denied, 119 S. Ct. 899 (1999).

Lastly, Johnson was not entitled to the accessory after the fact instruction simply because it was his theory of the case. "A defendant is always entitled to have his theory of the case, if it could amount to a lawful defense, fairly submitted to the consideration of the jury." United States v. Flom, 558 F.2d 1179, 1185 (5th Cir. 1977) (emphasis added); see United States v. Lamp, 779 F.2d 1088, 1097 (5th Cir. 1986). Accessory after the fact, unlike self-defense, is not a lawful defense to the crime

19

of capital murder.  The trial judge's refusal to instruct the jury on accessory after the fact therefore did not amount to a violation of due process.  See Lamp, 779 F.2d at 1097 (stating that failure to give defendant's proffered instruction was not error where theory, even if believed, "would not have warranted acquittal"); United States v. Grapp, 653 F.2d 189, 195 (5th Cir. Unit A Aug. 1981) ("Reversible error occurs when there is an evidentiary foundation for the defense and the defense would be legally sufficient to warrant an acquittal if believed by the jury.").  We thus affirm the district court's denial of habeas relief on this issue.

## C. Limitation on Testimony Regarding Fields's Motive

Johnson's next argument on appeal is that the trial court's limitation on his cross-examination of Fields regarding Fields's motive to kill Officer Langham violated his rights under the Confrontation Clause, as incorporated to the states through the Fourteenth Amendment.  The trial court's grant of the state's motion in limine prevented the introduction of testimony or evidence concerning Fields's belief that Officer Langham had previously killed an African-American man.  According to Johnson, the court's ruling prevented him from effectively impeaching Fields by showing that he had a motive to kill Officer Langham.

The Mississippi Supreme Court rejected Johnson's argument in his direct appeal, concluding that "[t]he mere fact Langham had

20

[previously] killed a black man in and of itself had no relevancy to this case." Id. at 211. Whether the trial court's refusal to allow cross-examination on this subject violated Johnson's constitutional rights is a mixed question of law and fact that this court reviews de novo. See Gochicoa, 118 F.3d at 445. A state court's evidentiary rulings present cognizable habeas claims only if they run afoul of a specific constitutional right or render the petitioner's trial fundamentally unfair. See Cupit v. Whitley, 28 F.3d 532, 536 (5th Cir. 1994).

We are unpersuaded by Johnson's argument that his inability to delve into whether Fields was aware that Officer Langham had previously killed an African-American man violated his rights under the Confrontation Clause. "[T]rial judges retain wide latitude insofar as the Confrontation Clause is concerned to impose reasonable limits on such cross-examination based on concerns about, among other things, harassment, prejudice, confusion of the issues, the witness' safety, or interrogation that is repetitive or only marginally relevant." Delaware v. Van Arsdall, 475 U.S. 673, 679 (1986). In order to determine whether a trial court's restriction on cross-examination is reasonable, "we must assess whether the jury was given adequate information to appraise the bias and motives of the witness." United States v. Mizell, 88 F.3d 288, 293 (5th Cir. 1996); see United States v. Cooks, 52 F.3d 101, 104 (5th Cir. 1995).

21

The trial judge in this case allowed extensive testimony and questioning regarding potential sources of Fields's bias and his credibility as a witness. First, throughout the cross-examination of Fields, Johnson's attorney questioned Fields regarding multiple inconsistent statements Fields had made before Johnson's trial. Second, Johnson's attorney questioned Fields extensively regarding Fields's guilty plea to accessory after the fact and his incentive to testify that Johnson had killed Officer Langham in order to exculpate himself of the killing. Third, Fields admitted on cross-examination that, during some portion of his direct-examination testimony, he was not testifying from personal knowledge, but rather that he was relying on information provided by "the investigators that were questioning" him. Further, Fields admitted on cross-examination that sometimes when he "get[s] nervous and upset, it's hard for [him] to tell the truth," and that he was nervous and upset when he gave several statements to the authorities. In addition, Fairley's testimony that he had seen Fields murder Officer Langham raised a strong inference that Fields was lying. Given the testimony the jury heard regarding Fields's incentive to testify favorably for the state, we do not believe that the jury would have received a significantly different impression of Fields's credibility had defense counsel been able to cross-examine Fields on his belief that Officer Langham had killed an African-American man. See Van Arsdall, 475 U.S. at 680; Mizell, 88 F.3d at 294 (concluding that

22

excluded impeachment evidence did not violate defendant's Confrontation Clause rights, given extensive admitted impeachment evidence); United States v. Hamilton, 48 F.3d 149, 155 (5th Cir. 1995) (concluding that because "so much additional impeachment evidence was admitted," trial judge's refusal to allow impeachment of witness in certain area "could not have affected the trial so as to prejudice [the defendant's] substantial rights").

We are also convinced that the trial court's refusal to allow testimony on whether Fields believed that Officer Langham had previously killed an African-American man did not violate Johnson's rights under the Due Process Clause by rendering Johnson's trial fundamentally unfair. The failure to admit evidence amounts to a due process violation only when the omitted evidence is a crucial, critical, highly significant factor in the context of the entire trial. See Thomas v. Lynaugh, 812 F.2d 225, 230 (5th Cir. 1987). Again, we agree with the district court that the mere fact that Fields may have known that Officer Langham had killed an African-American man would not have been a crucial, critical, highly significant factor in the context of the entire trial.

Johnson also argues that his rights under the Confrontation Clause were violated because the trial court "refused to allow the defense to []examine Fairley on a statement made to him by Fields that '[Fields] knew the Highway Patrolman had murdered a

black person and that if [Fields] let him go he thought the Highway Patrolman would go for his gun and kill us before we could leave.'" We find no authority in support of Johnson's assertion that his rights under the Confrontation Clause extend to the opportunity to impeach the state's primary witness through the testimony of a witness favorable to the defense.[7] See, e.g., Davis v. Alaska, 415 U.S. 308, 315-16 (1974) ("The main and essential purpose of confrontation is to secure for the opponent the opportunity of cross-examination.") (internal quotation marks omitted) (emphasis in original); cf. United States v. Kindig, 854 F.2d 703, 709 (5th Cir. 1988) (stating that Confrontation Clause is not implicated where witness's testimony is not adverse to defendant).

Further, we note that, despite Fairley's assertion in his affidavit that he was "not allowed to testify" to his entire statement, the motion in limine did not prevent Fairley from testifying that Fields had admitted to killing Officer Langham or that Fields was worried that "if he let [Officer Langham] go he thought the Highway Patrolman would go for his gun and kill us

---

[7] Even assuming that the trial court's evidentiary limitation prevented Johnson from offering the testimony of a favorable witness, and that this prohibition infringed Johnson's rights under the Compulsory Process Clause of the Sixth Amendment, such infringement was harmless. Given the scope of impeachment evidence allowed as to Fields's bias to testify in favor of the state and his credibility as a witness, we do not believe that the omission contributed "beyond a reasonable doubt" to the verdict. Van Arsdall, 475 U.S. at 684; see Crane v. Kentucky, 476 U.S. 683, 691 (1986).

24

before we could leave." The motion in limine therefore only prevented Fairley from testifying that Fields believed that Officer Langham had previously killed an African-American man. The omission of this information, as we concluded supra, did not amount to a violation of Johnson's due process rights. We therefore affirm the district court's denial of habeas relief on this ground.

**D. Trial Court's Denial of Johnson's Continuance Motion**

Johnson next claims that the trial court's refusal to grant a continuance to obtain the attendance of allegedly crucial expert witnesses denied his right to a fair trial. The experts in question were forensic scientists, Dale Nute and James Halligan, both of whom were allegedly prepared to testify that cuts on Johnson's hands were consistent with his defense that he tried to prevent Fields from stabbing Officer Langham with the knife. According to Johnson, scheduling conflicts prevented the two men from testifying.

The Mississippi Supreme Court rejected this claim on Johnson's direct appeal, concluding it was "frivolous" because Johnson did not attach any affidavits to his continuance motion indicating the materiality of the experts' testimony and because he filed his motion only ten days before his trial was set to begin. Johnson, 477 So. 2d at 210-11. The district court concluded that the state trial court had not abused its

25

discretion in denying the continuance motion, and, in any event, that Johnson had failed to show that the experts' testimony would have altered the verdict. We review Johnson's claim that the trial court's denial of his continuance motion amounted to a due process violation de novo. See Schrader v. Whitley, 904 F.2d 282, 288-89 (5th Cir. 1990).

As the district court correctly noted, "'[w]hen a denial of a continuance forms a basis of a petition for a writ of habeas corpus, not only must there have been an abuse of discretion but it must have been so arbitrarily and fundamentally unfair that it violates constitutional principles of due process.'" Schrader, 904 F.2d at 288 (quoting Hicks v. Wainwright, 633 F.2d 1146, 1148 (5th Cir. Unit B Jan. 1981)). Among the factors we must consider in determining whether a trial court abused its discretion in denying a continuance motion are: the defense's diligence in interviewing and procuring the presence of the witnesses, the defense's estimation of the probability of procuring live testimony within a reasonable time, the specificity with which the defense is able to describe the expected testimony, the degree to which such testimony is expected to be favorable to the accused, and the unique or cumulative nature of the testimony. See id.; Hicks, 633 F.2d at 1149.

We agree with the Mississippi Supreme Court and the district court that Johnson has failed to show that the trial court abused its discretion in denying the continuance motion. Johnson's only

26

argument in support of his contention that the trial court abused its discretion in denying the motion is that, quoting United States ex rel. Martinez v. Thomas, 526 F.2d 750, 755 (2d Cir. 1975), "a myopic insistence upon expeditiousness in the face of a justifiable request for delay can render the right to defend with counsel an empty formality." We agree with Johnson that, under some circumstances, a trial court's refusal to grant a continuance can interfere with a defendant's constitutional rights. See Hicks, 633 F.2d at 1149-50 (concluding that trial court's denial of continuance motion violated petitioner's due process rights). However, unlike in Hicks, Johnson has presented no evidence that he informed the trial judge of the uniqueness, materiality, and imminent availability of his witnesses' live testimony. On the contrary, Johnson attached no affidavits to his continuance motion indicating what the experts' proposed testimony would be or addressing the materiality or necessity of their testimony. Moreover, on August 18, 1982, twelve days before the trial was to begin, the trial court told Johnson's counsel that "I don't know what [the experts are] going to testify to or anything about it and I don't know where it's material or immaterial . . . ." Johnson's attorney only replied that Johnson would likely call the experts to testify, and that the availability of the experts was important to "help [the defense] understand the basis of [the state's] case." Unlike in Hicks, where it was clear that the witness at issue would be

available to testify later that day, see id. at 1148, Johnson's counsel gave no indication when Nute and Halligan could give testimony. Thus, we conclude that, given the lack of specificity with which Johnson's counsel described the experts' proposed testimony, the materiality of the testimony, or the probability of procuring the presence of the experts within a reasonable time, the trial court did not abuse its discretion in denying Johnson's motion for a continuance. We therefore affirm the district court's denial of habeas relief on this issue.

## E. **Batson** Claim

Johnson next claims that he is entitled to collateral relief because his conviction for capital murder was the result of racial prejudice in the selection of his jury, relying on Batson v. Kentucky, 476 U.S. 79 (1986). Specifically, he requests that this court order a Batson hearing in light of his assertion that the prosecutor in Johnson's trial used each of his seven peremptory challenges to strike African Americans from the jury.

Prior to his trial, Johnson moved the court for an order to enjoin the prosecution from using peremptory challenges to exclude African Americans from the jury. The trial court granted Johnson's motion. Johnson maintains that, despite the motion, at his trial the prosecution exercised all seven of its peremptory challenges to strike African Americans. It is clear from the record that Johnson did not object to the prosecution's use of

28

its peremptory strikes during his trial. Johnson first raised his argument that, under Batson, he had made a prima facie showing that the state's use of its peremptory strikes violated the Equal Protection Clause in his first motion for post-conviction relief.

We agree with the district court that the state court relied on a procedural bar in denying relief on this issue. Under the procedural default doctrine, a federal court may not consider a state prisoner's federal habeas claim when the state has based its rejection of that claim on an independent and adequate state ground. See Martin, 98 F.3d at 847. We conclude that the Mississippi Supreme Court based its rejection of Johnson's Batson claim on state procedural bars independent of the merits of the claim--namely, that Johnson had failed to object to the state's use of its peremptory challenges during his trial and that he failed to raise the issue on direct appeal. In the first paragraph of its opinion, the court stated that it would "address only those assignments contemplated by the [Mississippi Uniform Post-Conviction Collateral Relief Act] for which we are authorized to review in a petition of this nature." Johnson, 511 So. 2d at 1335. It then proceeded to discuss the two procedural bars relevant to Johnson's Batson claim, a petitioner's failure to raise an objection during his or her trial and a petitioner's failure to raise an issue on direct appeal. See id. at 1336

29

(quoting MISS. CODE ANN. § 99-39-21).[8]  The Mississippi Supreme

Court's failure to discuss Johnson's <u>Batson</u> claim on the merits,

in light of its statement that it found those issues that it did

not discuss on the merits to be procedurally barred, convinces us

that the state court based its rejection of this claim on a state

procedural bar.

Johnson's argument that the state court failed to "clearly

state[] and appl[y]" a procedural bar because it mistakenly did

not list his <u>Batson</u> claim in its list of claims that were

procedurally barred lacks merit.  <u>See</u> <u>id.</u> at 1342 (denying as

procedurally barred three claims, including Johnson's <u>Brady</u>

claim, discussed <u>supra</u>, that Johnson had "failed to raise at

trial or on the direct appeal").  Simply put, it does not fairly

appear from our reading of the state court's opinion that the

Mississippi Supreme Court "rested its decision primarily on

federal law"; thus, we need not reach the question of whether the

state court's opinion "contains a plain statement that its

_____

[8] That section provides in part:

> Failure by a prisoner to raise objections, defenses,
> claims, questions, issues or errors either in fact or
> law which were capable of determination at trial and/or
> on direct appeal, regardless of whether such are based
> on the laws and the Constitution of the state of
> Mississippi or of the United States, shall constitute a
> waiver thereof and shall be procedurally barred, but
> the court may upon a showing of cause and actual
> prejudice grant relief from the waiver.

MISS. CODE ANN. § 99-39-21(1).

30

decision rests upon adequate and independent state grounds."
Harris v. Reed, 489 U.S. 255, 261 (1989) (internal quotation
marks omitted) (alterations omitted); see Young v. Herring, 938
F.2d 543, 548 (5th Cir. 1991) (en banc).  In sum, "any ambiguity
that may have existed pertained only to the precise state law
ground on which Mississippi based its rejection of [Johnson's]
claim, and such an ambiguity is not relevant to a Harris plain
statement analysis."  Young, 938 F.2d at 551.

Thus, we conclude that the Mississippi Supreme Court based
its rejection on a state procedural ground independent of the
merits of Johnson's claim.  In addition to the requirement that
the state procedural ground relied upon by the state court be
independent of the merits of the claim, the procedural bar must
also be adequate; i.e., the procedural rule must be strictly or
regularly applied by the state to the vast majority of similar
claims.  See Martin, 98 F.3d at 847; Amos, 61 F.3d at 339.  This
requirement has been met here; the Mississippi Supreme Court
regularly applies the contemporaneous objection rule to Batson
claims.  See Wiley v. Puckett, 969 F.2d 86, 103 (5th Cir. 1992);
Hill v. Black, 887 F.2d 513, 516-17 (5th Cir. 1989), vacated on
other grounds, 498 U.S. 801 (1990), reinstated, 920 F.2d 249 (5th
Cir. 1990).

Unlike the Brady/Giglio claim discussed supra, Johnson does
not attempt to show cause for, or actual prejudice resulting
from, his procedural default.  We are therefore precluded from

31

considering the merits of this claim, and we affirm the district court's denial of habeas relief on this issue.

**F.  The Capital Murder Instruction**

In his final claim of error, Johnson argues that the trial court's failure to instruct the jury on an essential element of the offense of murder violated his constitutional rights. Specifically, Johnson contends that the instruction describing the offense of murder to the jury relieved the state of its burden to prove intent on Johnson's part, as required by Mississippi Code § 97-3-19.

The jury instruction at issued provided that "[t]he defendant, Samuel Johnson, has been charged by an indictment with the crime of capital murder for having wilfully, unlawfully, feloniously, of his malice aforethought and without authority kill[ed] and murder[ed] Billy Morris Langham, a human being . . . ."  The second part of the instruction was composed of six requirements for a guilty verdict, including the following two:

> 1) The defendant, Samuel Johnson, aided and commanded Charles Montgomery to commit capital murder by stabbing Officer Billy Morris Langham with a knife and ordering Charles Montgomery to shoot Officer Billy Langham; and
> 2) That Charles Montgomery wilfully, unlawfully, feloniously and of his malice aforethought and without authority of law kill[ed] and murder[ed] Billy Morris Langham . . . .

Johnson argues that the jury instruction failed to instruct the jury that they must find that Johnson intended to kill

32

Officer Langham, and instead allowed the jury to impute the intentions of Montgomery to Johnson.

The Mississippi Supreme Court rejected this argument on Johnson's direct appeal. See Johnson, 477 So. 2d at 212. According to the state court, "[i]t can be readily observed that the first part of [the instruction] requires intent on the part of Johnson to kill Langham," and the second part of the instruction "clearly define[s] the acts necessary to come within the capital murder framework." Id. The Mississippi Supreme Court concluded that "[t]he jury could not have been misled by this instruction." Id.

As we stated in Kinnamon v. Scott, 33 F.3d 462 (5th Cir. 1994), "[a]s a federal habeas court, our question is whether the ailing instruction by itself so infected the entire trial that the resulting conviction violates due process, not merely whether the instruction is undesirable, erroneous, or even universally condemned." Id. at 465 (internal quotation marks omitted) (citing Henderson v. Kibbe, 431 U.S. 145, 154 (1977)); see Livingston v. Johnson, 107 F.3d 297, 312 (5th Cir.), cert. denied, 118 S. Ct. 204 (1997). We agree with the district court's conclusion that "[a]lthough the instruction could have been made clearer, its problematic portions regarding intent were not so egregious as to violate due process." Considering the charge as a whole, the testimony adduced at trial, and the arguments of counsel, we are not persuaded that there is a

33

"reasonable likelihood that the jury applied the instruction in a constitutionally impermissible way."  Kinnamon, 33 F.3d at 465. We therefore affirm the district court's denial of collateral relief on this issue.

### III.  CONCLUSION

For the foregoing reasons, we AFFIRM the judgment of the district court.