**UNITED STATES of America,
Plaintiff-Appellee,**

v.

**Robert Lyle LAMP, Jr., Michael J. Yuretich and Mark Alan Eberwine,
Defendants-Appellants.**

No. 85–2120.

United States Court of Appeals,
Fifth Circuit.

Jan. 6, 1986.

Vincent Callahan, San Antonio, Tex. (Court-appointed), for Lamp.

Mark Stevens, San Antonio, Tex., for Yuretich.

Nancy Blair Barohn, Asst. Fed. Pub. Defender, San Antonio, Tex., for Eberwine.

Helen M. Eversberg, San Antonio, Sidney Powell, LeRoy Morgan Jahn, Asst. U.S. Attys., San Antonio, Tex., for plaintiff-appellee.

Before GARWOOD, HIGGINBOTHAM and DAVIS, Circuit Judges.

W. EUGENE DAVIS, Circuit Judge:

These appeals were lodged by Lamp, Eberwine and Yuretich from judgments of conviction entered after a joint jury trial. All three defendants were convicted of conspiracy to defraud the United States by impeding the Internal Revenue Service in ascertaining and collecting income tax owed by Lamp in violation of 18 U.S.C. § 371 (Count 1). Lamp alone was convicted of attempting to evade income tax liability in 1979 (Count 2) and 1980 (Count 3) in violation of 26 U.S.C. § 7201. In addition, Eberwine and Yuretich were convicted of committing perjury before the grand jury in violation of 18 U.S.C. § 1623 (Count 4), Lamp was also convicted of aiding and abetting Eberwine and Yuretich in the commission of perjury in violation of 18 U.S.C. §§ 2 and 1623 (Count 5).

Before discussing the issues raised by appellants, some of which are common to all defendants and others peculiar to each defendant, a brief, general statement of background facts in a light most favorable to the verdict is in order; more detailed facts will be discussed where material to the particular contention made.

I.

This case began with the government's investigation of illegal drug trafficking by Lamp, Eberwine and an unindicted co-conspirator named Werning. The government's evidence showed that during 1979 and 1980 Lamp and Eberwine each received between $2,500 and $11,500 per week from the manufacture and sale of methamphetamine. The government showed an increase in Lamp's net worth by showing the value of automobiles and real estate purchased and improved by Lamp during this period of time. Frequently title to automobiles and other property was placed in the name of others, including Eberwine, Yuretich and Werning to conceal Lamp's interest in the property. Using the net worth method of calculating adjusted gross income, the jury was entitled to find that Lamp had a minimum taxable income in 1979 of at least $28,000 on which he owed taxes of approximately $3,400; Lamp had declared that he had no income in 1979. For 1980, the jury was entitled to find that Lamp's minimum taxable income arrived at by this method was at least $35,000 on which he owed taxes of approximately $7,800. Lamp had filed no return for 1980.

The government's case against Eberwine for conspiring to defraud the United States in the ascertainment and collection of Lamp's income tax was predicated principally upon evidence that Eberwine assisted Lamp in concocting a story to justify Lamp's increase in net worth and to support Lamp in his assertion that he did not own certain property. The perjury charge against Eberwine was predicated on false

statements that Eberwine made on this same subject to the grand jury. The government's case against Yuretich, who was not involved in the drug trafficking, evolved around Yuretich's assertion to the IRS and the grand jury that he owned a 1980 Corvette.

## II.

### *Sufficiency of the Evidence*

Lamp challenges the sufficiency of the evidence used to convict him of aiding and abetting Eberwine and Yuretich in the commission of perjury. He does not challenge the sufficiency of the evidence to support his conviction on the remaining counts. Eberwine and Yuretich challenge the sufficiency of the evidence to convict them for conspiracy and perjury.

In evaluating the sufficiency of the evidence, the evidence must be considered in the light most favorable to the verdict, with all reasonable inferences and credibility choices made to support the jury's verdict. *Glasser v. United States,* 315 U.S. 60, 80, 62 S.Ct. 457, 469, 86 L.Ed. 680 (1942); *United States v. Graves,* 669 F.2d 964 (5th Cir.1982). We must affirm if, after viewing the evidence in the light most favorable to the verdict, "any rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt." *Jackson v. Virginia,* 443 U.S. 307, 319, 99 S.Ct. 2781, 2789, 61 L.Ed.2d 560 (1979); *United States v. Chagra,* 669 F.2d 241, 257 (5th Cir.), *cert. denied,* 459 U.S. 846, 103 S.Ct. 102, 74 L.Ed.2d 92 (1982).

█ Lamp's contention that the evidence was insufficient to support his conviction for aiding and abetting Yuretich and Eberwine's perjury before the grand jury is meritless. Lamp concocted false stories to explain the source of his income and to disclaim ownership of several assets after IRS agent Barrows met with him at the start of the investigation in June of 1981. Lamp counselled Werning both before Werning met with IRS agents and before he appeared before the federal grand jury. At these meetings, Lamp instructed Wern-

ing how to answer questions about various assets and Lamp's sources of income. Lamp also met with Yuretich and Eberwine before their grand jury appearance. The details of the contrived story with respect to the ownership of the Corvette was covered with Yuretich. Lamp reviewed with Eberwine the various concocted stories they had told and planned to tell the grand jury so the grand jury testimony of the witnesses would be as consistent as possible. The circumstantial evidence clearly supported the conclusion that accounts given by the three defendants on the ownership of the 1980 Corvette and other assets were false and that Lamp's story regarding the source of his income was false. By fabricating these stories and counselling his friends and co-conspirators to relate them to IRS agents and the grand jury, Lamp clearly helped his co-conspirators commit perjury.

█ Similarly, the jury was entitled to conclude from the evidence that Eberwine and Yuretich willfully acted with Lamp and with each other to assist Lamp in avoiding his tax liability. As to Eberwine, the government produced evidence that tended to show that he coached Werning about the dates important to the back dated title to the 1980 Corvette; he encouraged another acquaintance to lie about Lamp's ownership of a pleasure boat and he asked Werning to record his interview with the IRS in June of 1981. This activity by Eberwine, together with evidence that he lied before the grand jury to assist Lamp cover up sources of his income and assets, are sufficient to support the finding that he was a conspirator.

Yuretich's involvement in the conspiracy arises from his false claims of ownership of the 1980 Corvette which he made both to the IRS agent and the grand jury. The jury was entitled to conclude that Yuretich followed Lamp's instructions and relayed to the grand jury the lie that Lamp counselled him to tell. The jury was also entitled to conclude that the Corvette was indeed purchased by Lamp and owned by him, contrary to the claims of Yuretich.

Eberwine contends that the government's evidence was legally insufficient to support his conviction for perjury because his answers were either literally true or, if not true, immaterial to the investigation.[1] The jury was entitled to interpret these answers as representations by Eberwine that he did not know of Lamp's involvement in the manufacture of methamphetamines during the time in question and that Eberwine had never had financial dealings with Robert Lamp, Jr., other than sharing an apartment with him. There is no merit to Eberwine's contention that the grand jury's inquiry into drug trafficking was immaterial to the investigation; the grand jury was clearly entitled to discover and investigate the source of Lamp's apparent wealth. As noted earlier, the evidence supported a finding that Lamp and Eberwine were partners in a complex illegal business of manufacturing and selling methamphetamines. Eberwine's contention that the evidence was insufficient to support the perjury conviction is therefore rejected.

We also find unpersuasive Yuretich's argument that the evidence was insufficient to support his conviction on either the conspiracy count or the perjury count. The jury was entitled to conclude that Yuretich was involved in the conspiracy to secrete Lamp's assets because of Yuretich's false claims to ownership of the Corvette which he made to IRS agent Barrows and to the grand jury. Yuretich was present at the meeting before the March 1, 1983 session of the grand jury when Eberwine coached Werning on the dates relavant to the back dating of the transfer of title on the 1980 Corvette; Yuretich's testimony before the grand jury the following day was consistent with Eberwine's coaching. Also, Yuretich filed the back dated transfer of title after Lamp was under investigation. Based on Yuretich's meager income and living expenses as well as the testimony of Werning, the jury was entitled to conclude that Yuretich did not own the Corvette and that he joined with Eberwine and Lamp to conceal Lamp's assets and help Lamp defraud the United States. Similarly, the jury was entitled to conclude that Yuretich lied when he told the grand jury that he gave Robert Lamp, Jr., $15,000 to purchase the 1980 Corvette for him.

### III.

#### *Severence*

Eberwine and Yuretich argue that the trial court abused its discretion in refusing the sever their cases and try them separately.

Persons who have been indicted together, as these defendants were, should ordinarily be tried together. *United States v. Harrelson*, 754 F.2d 1153, 1174 (5th Cir.), *cert. denied*, —— U.S. ——, 106 S.Ct. 277, 88 L.Ed.2d 241 (1985). They can obtain reversal of the district court's refusal to order severance under Rule 14, Fed.R. Crim.P., only if they can "demonstrate compelling prejudice against which the trial court [was] unable to afford protection." *Id.* Eberwine and Yuretich argue that prejudice was inevitable because the quan-

---

1. The responses which served as a basis for the government's perjury charge are as follows:

Q. What kind of work do you know Robert Lamp, Jr. to do?
A. Well, I feel what he does best is custom painting, auto work and motorcycle work, mechanical and paint and body.
Q. During 1979, 1979 and '80, did you know him to do anything else besides paint motorcycles?
A. For a living?
Q. Yes.
A. No.
Q. Did you know him to do any other kind of business that he received money from?
A. No.

Q. Do you know anything about any manufacture of methamphetamines during 1978, '79 or '80 involving any of these people that I have mentioned?
A. None.
Q. How about yourself with any of those people?
A. No.
Q. So it is your testimony that you have never had any kind of financial dealings yourself with Robert Lamp, Jr.?
A. Right, absolutely—other than paying half of the rent on the apartment that we shared.

tum and nature of the proof in their own cases was so different from the proof against the other defendants. Here, however, as in *Harrelson,*, the case against the various co-defendants was essentially one complex conspiracy case; and here, as in *Harrelson,* the trial court repeatedly gave appropriate limiting instructions to the jury. Furthermore, the disparity in the evidence was less in this case than it was in *Harrelson.* The district court did not abuse its discretion in denying the motions of Eberwine and Yuretich to sever.

## IV.

### *Objections to Evidentiary Rulings*

#### A.

■ All three defendants argue that the district court misapplied *United States v. James,* 590 F.2d 575 (5th Cir.) (en banc), *cert. denied,* 442 U.S. 917, 99 S.Ct. 2836, 61 L.Ed.2d 283 (1979), when it admitted certain hearsay testimony of Werning, the unindicted co-conspirator. We conclude that the district court did not commit clear error in determining that, even without the hearsay testimony, a preponderance of the evidence established that Werning and appellants were members of the conspiracy. *United States v. James, supra; United States v. Ackal,* 706 F.2d 523 (5th Cir. 1983). In considering whether Lamp and Eberwine were members of the conspiracy with Werning, the district court was entitled to consider Werning's testimony of Lamp's and Eberwine's *own* statements and action. This testimony alone supports the district court's conclusion. The district court was also entitled to conclude from evidence independent of the hearsay testimony that Yuretich was a member of the conspiracy. In making this determination, the district court was entitled to consider Werning's accounts of Yuretich's false statements. Other evidence, independent of the controverted hearsay testimony that supported this conclusion, included: the similarity of the false statements made by Yuretich to those made by Werning, Lamp

and Eberwine to the IRS agents and the grand jury and acknowledged by Werning to have been false; evidence of Yuretich's presence at a meeting the day before a grand jury session where the concocted story about the purchase and ownership of the Corvette was discussed and Yuretich's testimony the following day before the grand jury that was consistent with the "coaching" session.

Lamp argues that the trial court erred in not holding a hearing before ruling on the admissibility of the co-conspirator's hearsay. *James,* however, expressly permits trial courts to forego such a hearing when "it determines it is not reasonably practical." 590 F.2d at 582. The trial court obviously so determined in this case.

The defendants complain of several other rulings by the district court admitting evidence against them.

#### B.

■ Yuretich argues that certain charts and summaries designed to support the government's case were erroneously admitted because they were cumulative. This court rejected a similar argument in *United States v. Means,* 695 F.2d 811, 817 (5th Cir.1983). The district court did not abuse its discretion in allowing the government to use charts and summaries in this complex tax evasion case.

#### C.

■ Lamp argues that Fed.R.Evid. 615[2] was violated because Werning discussed his testimony with his brother, who, apparently without Werning's knowledge, had been subpoenaed by Eberwine on the evening of the first day of the trial. Even though Werning's brother was never called as a witness, Lamp now argues that the district court should have excluded all of Werning's testimony because of his violation of the court's sequestration order.

---

**2.** Rule 615 provides, in part, that: "At the request of a party, the court shall order witnesses

excluded so that they cannot hear the testimony of other witnesses, . . . ."

In *United States v. Warren*, 578 F.2d 1058, 1076 (5th Cir.1978) (en banc), we rejected "such a draconian sanction[,] tantamount to an exclusionary rule," and held that the burden is on the defendant to demonstrate "sufficient prejudice to require reversal." Rule 615 "is designed to avoid the testimony of one witness improperly influencing that of another." *Id.* Because Werning's brother was never called as a witness, Lamp failed to demonstrate that he suffered prejudice as a result of the violation of Rule 615. Consequently, Lamp's argument is rejected.

### D.

■ Lamp and Eberwine argue that the district court erred in admitting evidence of their involvement in the other crimes, the manufacture and sale of methamphetamines.

The source of Lamp's income was a relevant issue in the tax evasion and conspiracy counts. Consequently, the district court did not abuse its discretion in admitting evidence of the drug trafficking to show the nature and extent of Lamp's income. Because the evidence was admitted on a question that was directly at issue in the charges for which defendants were on trial, the drug-related offenses are not "extrinsic" to this prosecution and it is unnecessary to consider the admissibility of this evidence as extrinsic offenses under Fed.R. Evid. 404(b). *United States v. Carrillo*, 561 F.2d 1125 (5th Cir.1977).

### E.

■ Eberwine argues that his personal income tax returns for two years during the existence of the conspiracy, which were admitted into evidence over his objection, were irrelevant and unduly prejudicial. The government offered Eberwine's return to rebut his assertion that he was legitimately employed during the years in question and to support the government's theory that Eberwine was Lamp's partner. This tended to establish that Eberwine had a motive for helping Lamp frustrate the IRS's investigation. The district court did not abuse its discretion in admitting this evidence.

### F.

Yuretich and Eberwine suggest that two packets of information that the district court examined *in camera* may contain material that should have been disclosed to them under the Jencks Act. After reviewing this evidence, we agree with the district court that the material falls outside the Jencks Act.

### G.

All three defendants complain that the district court abused its discretion in limiting their cross-examination of certain witnesses.

■ They argue first that the court should not have limited the cross-examination of attorney Myles Appleberry. Appleberry, who had once represented Lamp and Werning, was called by the government to rebut Lamp's claim that he filed his tax returns during the IRS investigation on the basis of Appleberry's advice. The court declined to allow Appleberry to be cross-examined about any possible conflict of interest arising from his having represented both Werning and Lamp.

Lamp argues that *United States v. Abel*, —— U.S. ——, 105 S.Ct. 465, 83 L.Ed.2d 450 (1984), requires that a defendant always be given an opportunity to demonstrate the bias of a witness who may have a conflict of interest. This reading of *Abel* is much too broad. First, *Abel* upheld the admission of evidence, which is very different from reversing a trial court's decision to exclude evidence. In affirming the trial judge's decision to admit the evidence, the Court in *Abel* expressly emphasized the wide discretion a district court enjoys in making determinations of admissibility. Second, the evidence at issue in *Abel* was much more clearly probative of bias than the evidence at issue in this case. *Abel* involved a witness and a defendant who both belonged to a violent secret society (the Aryan Brotherhood) whose members

were sworn to commit perjury to advance the aims of the society. Mr. Appleberry is a licensed attorney, with no apparent reason to commit perjury. The fact that he represented both Lamp and Werning lends no support to this contention. The district court did not abuse its discretion in limiting cross-examination of the witness.

■ Lamp, relying on *Abel*, also argues that he should have been allowed to cross-examine IRS Agent Barrows, who managed the investigation of his tax case, about the allegedly "demeaning and inhumane and degrading arrest" of Lamp. The proffer by Lamp revealed that Barrows was one of eight government agents present at the arrest, that Barrows waited outside Lamp's apartment until the arrest had been accomplished, and that Agent Barrows himself insisted that Lamp be allowed to get dressed before being transported to jail. Barrows' participation in the arrest was so unrelated to Barrows' supposed incentive to falsify his testimony the district court did not abuse its discretion in keeping this line of questioning out of the trial.

■ Eberwine and Yuretich, argue that the trial court erred in prohibiting Werning from being cross-examined about his possession of a handgun a few days before the beginning of the trial. The defendants suggested that this was relevant either: 1) to prevent the jury from supposing that Werning, who admitted that he and the defendants were co-conspirators, was now "reformed" or 2) to suggest that Werning's motive for testifying against the defendants was to curry favor with the prosecutor, who would have been in a position to decide whether to bring firearms charges against him.

We agree with the government that all of this is quite far-fetched. Werning was extensively cross-examined about his prior arrests, his involvement with illegal drugs, and his immunity agreement with the government. The jury therefore had ample information that would dispel any naive inference that Werning's testimony was motivated by public-spiritedness. Further, the evidence presents no reason to suppose that Werning thought the authorities were investigating him for illegal possession of a gun. Also, the evidence does not suggest an awareness by any law enforcement agency of the firearm allegation until Eberwine's lawyer brought it up during his cross-examination of Werning. The trial court did not abuse its discretion in excluding this evidence.

### H.

■ Eberwine, having made no timely objection, now argues that it was plain error for the prosecution, during its closing argument, to emphasize Eberwine's involvement in the illegal drug enterprise and his possible tax problems, none of which was directly at issue in the government's case against him. The district court did not err in permitting the government to respond to defense counsel's arguments disclaiming any association between Eberwine and Lamp in the drug business and questioning the government's failure to charge Eberwine with tax evasion. Also, immediately after the prosecutor made the remarks, which are complained of, the trial judge admonished the jury not to convict the defendants on the basis of anything they were not charged with.

### V.

### *Jury Charges*

Eberwine and Yuretich argue that the district court erred in refusing to give three of their requested jury instructions.

Under *United States v. Grissom*, 645 F.2d 461, 464 (5th Cir.1981), a "trial judge's refusal to deliver a requested instruction constitutes reversible error if, but only if, the instruction (1) is substantively correct; (2) was not substantially covered in the charge actually delivered to the jury; and (3) concerns an important point in the trial so that the failure to give it seriously impaired the defendant's ability to effectively present a given defense." The government argues that none of the instructions re-

quested in this case meets either the first or third prong of this test.

Yuretich complains that he should have been granted a good character instruction on the basis of a government witness' remark that he had employed Yuretich for a short time in 1976 and found him to be honest. We agree with the government that the district court was entitled to conclude that the witness was not qualified as a character witness and could not have been so qualified because his acquaintance with Yuretich ended five to seven years before the events occurred that led to these charges.

Eberwine argues that he should have been given a good character instruction on the basis of the testimony of his witness Watson. But Watson was not qualified as a character witness who had knowledge or opinions concerning Eberwine's reputation for truth and veracity. Counsel for Eberwine rejected the government's suggestion at the trial that Watson was open for cross-examination as a character witness. The district court did not err in rejecting this charge.

Eberwine and Yuretich argue that the trial court should have given an instruction commenting on the government's failure to call John Jasper as a witness. The district court was not obliged to give this charge, however, because appellants did not establish that Jasper was peculiarly under the government's control or that he was not equally available to both parties. *United States v. Parr*, 516 F.2d 458, 471 (5th Cir.1975).

Yuretich complains that the trial judge did not adequately warn the jury that Yuretich was uninvolved in the illegal drug business that formed the backdrop to this case. To the contrary, the record reveals clear instructions by the district court that Yuretich was not a part of the drug cartel. Counsel for the government in their opening and closing statements also made it clear that they did not contend that Yuretich was involved in the drug trafficking.

Yuretich also argues that the trial judge's refusal to give a proferred instruction concerning the lack of involvement in the drug activity was a refusal to submit defendant's theory of the case to the jury. Because this "theory" of Yuretich—that he was uninvolved in the drug business— would not have warranted acquittal, this was not a "theory of the case" on which an instruction was required. *See United States v. Grapp*, 653 F.2d 189, 195 (5th Cir.1981).

All three defendants complain of the trial court's refusal to allow them to conduct post-verdict interviews with a juror who they contend may have been either coerced or misled into voting to convict.

During the course of deliberations, the jury sent a note to the judge, asking if they could make sentencing recommendations. In response, the judge instructed them not to discuss or consider punishment. The defendants now argue that the jury may have agreed to convict Eberwine and/or Yuretich only because of "outside information" suggesting that they would receive light sentences. After the verdict was delivered, one of the jurors contacted the attorneys for Eberwine and Yuretich to inform them that he had been pressured by the other jurors to join them in voting to convict these two defendants. This juror also called the trial judge and told him the same thing; in response to questions from the judge, the juror told the district judge, however, that he had not been pressured or influenced by any source outside the jury room.

On these facts, there was no reason for the district court to depart from the general prohibition against post-verdict interviews of jurors by parties or their attorneys. Fed.R.Evid. 606(b) specifically prohibits jurors from testifying about their own mental processes or about anything that was said in the jury room. Apart from speculation by the defendants, there is no reason to suspect that any extraneous prejudicial information influenced the deliberations. The district court correctly de-

clined to permit inquiry into the jury's deliberations.

## VI.

### Objections to Sentence

 Lamp, who faced a maximum possible sentence of twenty-five years in prison, was given a twelve-year term. He argues that this sentence was disproportionate under *Solem v. Helm,* 463 U.S. 277, 103 S.Ct. 3001, 77 L.Ed.2d 637 (1983). In *Solem,* the Supreme Court held that a defendant was unconstitutionally sentenced to life imprisonment without parole, under an habitual-offender statute, following conviction for passing a bad check. Lamp's sentence was certainly not disproportionate within the meaning of *Solem v. Helm,* which recognized that: "In view of the substantial deference that must be accorded legislatures d sentencing courts, a reviewing court rarely will be required to engage in extended analysis to determine that a sentence is not constitutionally disproportionate." 463 U.S. at 290 n. 16, 103 S.Ct. at 3009 n. 16. *See also Whitmore v. Maggio,* 742 F.2d 230 (5th Cir.1984).

 Eberwine and Yuretich argue that the sentencing judge employed a mechanical sentencing policy that violated *United States v. Cavazos,* 530 F.2d 4 (5th Cir. 1976), and *United States v. Hartford,* 489 F.2d 652 (5th Cir.1974). This argument is predicated on a remark made by the sentencing judge when he explained why he was rejecting Yuretich's plea for probation. He remarked that he could not recall ever declining to impose a prison sentence on someone who had been convicted of lying to a grand jury and went on to explain why he considered this such a serious offense.

In *Cavazos* the judge acknowledged that he refused to consider probation for persons convicted of certain offenses. In *Hartford* the judge automatically imposed a maximum statutory sentence on persons convicted of certain offenses. Here, the sentencing judge certainly considered giving Yuretich probation; there is no rule that forbids a judge from observing that he

has not yet found probation appropriate for a certain category of offenses. We find no defect in the sentence.

## VII.

### Revocation of Bond Pending Appeal

Lamp argues that the district court erred in revoking his bond pending appeal. Because Lamp failed to file a timely notice of appeal from the order of May 2, 1985, revoking the bond, this issue is not before the court.

## VIII.

The convictions and sentences appealed from are

AFFIRMED.