IN THE UNITED STATES COURT OF APPEALS
FOR THE FIFTH CIRCUIT

United States Court of Appeals
Fifth Circuit

**F I L E D**

January 17, 2008

Charles R. Fulbruge III
Clerk

No. 06-51528

UNITED STATES OF AMERICA

Plaintiff-Appellee

v.

JOHN C. SKELTON

Defendant-Appellant

Appeal from the United States District Court
for the Western District of Texas

Before KING, BARKSDALE, and DENNIS, Circuit Judges.

DENNIS, Circuit Judge:

The primary issue in this criminal case is whether the district court's limitations on cross-examination violated the defendant's Sixth Amendment confrontation right and right to present a complete defense. After careful review of the district court's evidentiary rulings, we affirm the defendant's conviction.

## I. BACKGROUND

John C. Skelton, Defendant, was indicted on one count for violating 18 U.S.C. § 875(b).[1] According to the trial testimony, sometime prior to February

---

[1] 18 U.S.C. § 875(b) provides:

Whoever, with intent to extort from any person, firm, association, or corporation, any money or other thing of value, transmits in interstate or foreign

24, 2006, Skelton called Terry Jacobs and had a short conversation regarding Slim Gabrel. Skelton hung up the phone because of a poor connection. On February 24, 2006, Skelton again called Jacobs. Skelton confirmed that he had called before and stated that "Slim Gabrel wants his money. He said you [Jacobs] stole your partner's money and didn't pay his life insurance. And Slim is going to get a percentage of that, what you stole." Jacobs stated that he did not steal anything and that he did not even know a Slim Gabrel. Skelton responded that he had seen the books, that Jacobs had indeed stolen money, and that although Slim Gabrel used to be a sheriff, he was now head of the West Texas Mafia. Jacobs stated that he did not know what Skelton was talking about to which Skelton responded that if he did not get the money, Jacobs would be murdered. Skelton explained that he had connections with the Ector County and Midland County Sheriff's Offices and that "[t]he way it's going to happen is, you're going to get stopped by a county patrol unit . . . and they're going to arrest you, put handcuffs on you, put you in the back seat, take you out in the country and shoot you in the head." Skelton also stated that "Slim wanted . . . me to go ahead and just kill you and collect the money from your wife . . . I don't think I'll do that . . . I'll just collect it from you, but I think it would be easier to collect it from your wife." Skelton instructed Jacobs to obtain two cashiers checks, one for $250,000 and the other for $50,000. The conversation ended with Skelton telling Jacobs that he would be in touch.

During the conversation, Jacobs was sitting next to his coworker, Victor Lujan, in an office building in Midland, Texas -- Skelton made the call from Arkansas. Lujan testified that during the conversation, Jacobs suddenly started shaking, his breathing patterns changed, and he became very nervous. At some

commerce any communication containing any threat to kidnap any person or any threat to injure the person of another, shall be fined under this title or imprisoned not more than twenty years, or both.

point, Jacobs handed the phone to Lujan, who testified that he heard the caller state that if Jacobs "didn't pay the money a city cop was actually going to pull him over [and] was going to handcuff him and shoot him."

On February 27 or 28, 2006, Jacobs spoke with Special Agent Dina Morales, who filled out a complaint reflecting that Jacobs had received a threatening phone call. She referred the case over to Texas Ranger Jess Malone. Malone and Morales ascertained the identity of the caller to be Skelton through phone records.[2] They met with Jacobs on March 3, 2006 and advised him to obtain a recording device in the event that Skelton called again. They also asked Jacobs if he suspected a motive for the calls. Jacobs explained that he had once worked for a company called Jolt Corporation ("Jolt"), which was formed in the early 1990's to purchase two companies, Hardrock (d/b/a MidTexas Construction) and Midwest Equipment. Jacobs was vice-president of Jolt, which eventually dissolved in 1999. He denied stealing money from the company but indicated that Jolt had failed to make payments on a life insurance policy on one of its co-owners, Don Towery, who died in 1999.[3] He believed that these were the events referred to by Skelton during their phone conversation.

On March 10, 2006, Skelton again called Jacobs and demanded he pay back the life insurance money. When Jacobs informed him that he did not have that kind of money, Skelton responded that there would be trouble. Skelton also stated, "And you're either gonna give that money back or I'm gonna deal with your ass, boy." During the call, Skelton indicated that he was aware that Jacobs maintained a double set of books, that he had stolen the insurance premiums when Towery was dying of cancer, and that he would "call the income tax people showing you [Jacobs] stole the federal FICA." At that point, Jacobs hung up the

---

[2] Deborah Middleton, a telecommunications specialist, testified with respect to these records at trial.

[3] Skelton and Don Towery were cousins.

phone, indicating on his recording device that he was nervous. During the next few weeks, Jacobs called Skelton -- at the urging of Morales and Malone -- in an attempt to get Skelton to threaten him again. However, Skelton made no further threats. He did at one point explain that he never wanted the money for himself; he only wanted Skelton to repay the previous co-owners of Jolt.

At trial, the district court did not permit defense counsel to ask Jacobs on cross-examination if he was only testifying to win favor with the Government in the event that the IRS investigates Jolt's financial books. The district court also denied Skelton's request to present extrinsic evidence that Jacobs was lying about stealing money from Jolt. However, the district court did allow some cross-examination regarding Jacobs prior dealings with Jolt. To that end, Jacobs testified that Towery's life insurance policy had lapsed because Jolt did not pay the premiums. He also testified that one of the companies owned by Jolt suffered a financial decline because Joe Moscarro, another co-owner, stole money from the company.[4] Defense counsel also asked Jacobs, "Isn't it a fact that you hung up within a second of [Skelton] mentioning the federal FICA so that the agents that were going to hear this tape wouldn't learn about that?" Jacobs responded, "No." He also denied that the "reason that [he] sounded more nervous at that time is because of this reference to FICA."

After the Government rested, Skelton moved for judgment of acquittal. The district court denied the motion. Skelton then called eight witnesses -- Shane Towery, Mary Ann Stephens, Sharon Miller, Tina Kennedy, Mildred Lipham, Johnny Oldham, Beverly Brock, and Lance Hall -- all of whom either worked for or were somehow associated with companies owned by Jolt. Each testified that Jacobs was not a truthful person and had the reputation for being

---

[4] SA Morales testified that there was proof that Moscarro had stolen money from one of the companies owned by Jolt.

untruthful. The district court did not permit these witnesses to testify about the allegations that Jacobs stole funds from Jolt and lied to the IRS.

During a break in the testimony, the parties presented arguments regarding the admissibility of rebuttal character testimony regarding Jacobs. Skelton maintained that he was entitled to ask the Government's rebuttal character witnesses "did you know" or "have you heard" questions involving specific alleged acts of dishonesty. The district court agreed that Skelton was entitled to ask such questions as: "Did you know Lance Hall, who was the brother-in-law of Shane Towery and the son-in-law of Mr. Towery, had an opinion that he thinks [Jacobs] wasn't truthful," but that Skelton was not entitled to pose such questions as: "Do you know or have you heard that Sharon Miller, who worked for Mr. Jacobs, showed Shane Towery a double set of books that had been maintained by Mr. Jacobs." Skelton argued that prohibiting him from asking such "did you know" or "have you heard" questions violated his confrontation right. The district court responded that it was following Rules 404, 405, and 608 of the Federal Rules of Evidence meticulously and overruled the objections. The Government proceeded to call five rebuttal witnesses -- Beau Estes, Jeff Neely, Mark Bergen, Stephen Castle, and Butch Willis -- all of whom testified that they knew Jacobs and that he was a truthful person. Skelton was not permitted on cross-examination to ask "did you know" or "have you heard" questions regarding specific alleged acts of dishonesty.

After the defense and the Government rested, Skelton renewed his motion for judgment of acquittal. The district court denied the motion. After two hours of deliberation, the jury sent the following note to the district court: "According to 18, U.S.C., Section 875(b), does 'threat to injure a person' mean we have to believe beyond a reasonable doubt that there was a threat to shoot or physical injury in general?" The district court heard arguments on the issue. The Government argued that the district court should simply refer the jury to the

instructions concerning the elements of the offense. Skelton argued that the district court should give the jury a specific instruction that the Government had to prove beyond a reasonable doubt that there was a threat to shoot Jacobs. The district court submitted the following response, "In response to Jury Note 1, you are referred back to the Court's Instructions to the Jury." The jury returned a verdict of guilty and Skelton was sentenced to 50 months imprisonment, three years of supervised release, and a $5,000 fine. He filed a timely notice of appeal.

## II. STANDARDS OF REVIEW

We review alleged violations of a defendant's Sixth Amendment confrontation right de novo. United States v. Bell, 367 F.3d 452, 465 (5th Cir. 2004). We also review alleged violations of a defendant's Sixth Amendment right to present a complete defense de novo. See United States v. Serrano, 406 F.3d 1208, 1214 (10th Cir. 2005) (citing United States v. Solomon, 399 F.3d 1231, 1239 (10th Cir. 2005)); see also United States v. Soape, 169 F.3d 257, 270 (5th Cir. 1999) ("We review . . . constitutional questions de novo."). Such claims, however, are subject to harmless error review. Bell, 367 F.3d at 465; see also United States v. Jimenez, 464 F.3d 555, 558 (5th Cir. 2006). If there is no constitutional violation, then we review a district court's limitations on cross-examination for an abuse of discretion, which requires a showing that the limitations were clearly prejudicial. Jimenez, 464 F.3d at 558-59 (citing United States v. Restivo, 8 F.3d 274, 278 (5th Cir. 1993)). Finally, we review the refusal to give a defense-tendered jury instruction for abuse of discretion. United States v. Correa-Ventura, 6 F.3d 1070, 1076 (5th Cir. 1993).

## III. ANALYSIS

### A. Cross-Examination of Jacobs

Skelton argues that the district court erred in limiting his ability to cross-examine Jacobs and otherwise present evidence regarding the allegations that Jacobs stole from Jolt and lied to the IRS. "While the scope of cross-examination

is within the discretion of the trial judge, this discretionary authority to limit cross-examination comes into play only after there has been permitted as a matter of right sufficient cross-examination to satisfy the Sixth Amendment." United States v. Elliott, 571 F.2d 880, 908 (5th Cir. 1978).[5] As the Supreme Court has emphasized:

> Cross-examination is the principal means by which the believability of a witness and the truth of his testimony are tested. Subject always to the broad discretion of a trial judge to preclude repetitive and unduly harassing interrogation, the cross-examiner is not only permitted to delve into the witness' story to test the witness' perceptions and memory, but the cross-examiner has traditionally been allowed to impeach, i.e., discredit, the witness. . . . A more particular attack on the witness' credibility is effected by means of cross-examination directed toward revealing possible biases, prejudices, or ulterior motives of the witness as they may relate directly to issues or personalities in the case at hand. The partiality of a witness is subject to exploration at trial, and is always relevant as discrediting the witness and affecting the weight of his testimony. We have recognized that the exposure of a witness' motivation in testifying is a proper and important function of the constitutionally protected right of cross-examination.

Davis v. Alaska, 415 U.S. 305, 315 (1974) (internal quotations marks and citations omitted). This right "is particularly important when the witness is critical to the prosecution's case." Jimenez, 464 F.3d at 559 (quoting United States v. Mizell, 88 F.3d 288, 293 (5th Cir. 1996)). However, "the Confrontation Clause guarantees an opportunity for effective cross-examination, not cross-examination that is effective in whatever way, and to whatever extent, the defense might wish." Delaware v. Fensterer, 474 U.S. 15, 20 (1985) (per curiam) (emphasis in original); see also Bigby v. Dretke, 402 F.3d 551, 573 (5th Cir. 2005) ("[T]he Confrontation Clause does not guarantee defendants cross-examination

---

[5] The Sixth Amendment guarantees that "[i]n all criminal prosecutions, the accused shall enjoy the right . . . to be confronted with the witnesses against him." U.S. Const. amend. VI.

to whatever extent they desire."). The district court has "wide latitude insofar as the Confrontation Clause is concerned to impose reasonable limits on such cross-examination based on concerns about, among other things, harassment, prejudice, confusion of the issues, the witness' safety, or interrogation that is repetitive or only marginally relevant." Delaware v. Van Arsdall, 475 U.S. 673, 679 (1986). Thus, the Confrontation Clause is generally satisfied when the defendant has been "permitted to expose to the jury the facts from which jurors, as the sole triers of fact and credibility, could appropriately draw inferences relating to the reliability of the witness." Restivo, 8 F.3d at 278 (quoting Davis, 415 U.S. at 318); see also United States v. Tansley, 986 F.2d 880, 886 (5th Cir. 1993) ("The relevant inquiry is whether the jury had sufficient information to appraise the bias and motives of the witness.").

In order to establish a violation of the confrontation right, the defendant need not establish that the jury would have reached a different result. Van Arsdall, 475 U.S. at 679-80. Instead, the focus is on the particular witness. Id. at 680. As the Supreme Court explained, "[i]t would be a contradiction in terms to conclude that a defendant denied any opportunity to cross-examine the witnesses against him nonetheless had been afforded his right to 'confront[ation]' because use of that right would not have affected the jury's verdict." Id. Thus, to establish a violation of the confrontation right, the defendant need only establish that "[a] reasonable jury might have received a significantly different impression of [the witness's] credibility had [defense] counsel been permitted to pursue his proposed line of cross-examination." Id. Finally, any violation of the confrontation right is subject to harmless error review by analyzing the following factors: "the importance of the witness' testimony in the prosecution's case, whether the testimony was cumulative, the presence or absence of evidence corroborating or contradicting the testimony of the witness on material points, the extent of cross-examination otherwise

permitted, and, of course, the overall strength of the prosecution's case." Van Arsdall, 475 U.S. at 684.

The determination of "[w]hether the exclusion of evidence is of a constitutional dimension depends on the [district] court's reason for the exclusion and the effect of the exclusion." Kittelson v. Dretke, 426 F.3d 306, 319 (5th Cir. 2005). This determination typically includes an inquiry into the admissibility of the evidence under the Federal Rules of Evidence.

Skelton first argues that any evidence relating to the allegations that Jacobs stole funds from Jolt and lied to the IRS is admissible as intrinsic "other act" evidence. "'Other act' evidence is 'intrinsic' when the evidence of the other act and evidence of the crime charged are 'inextricably intertwined' or both acts are part of a 'single criminal episode' or the other acts were 'necessary preliminaries' to the crime charged." United States v. Coleman, 78 F.3d 154, 156 (5th Cir. 1996) (quoting United States v. Williams, 900 F.2d 823, 825 (5th Cir. 1990)). "This evidence is admissible to complete the story of the crime by proving the immediate context of events in time and place." Id. (citing United States v. Kloock, 652 F.2d 492, 494-95 (5th Cir. 1981); United States v. Royal, 972 F.2d 643, 647 (5th Cir. 1992)). Intrinsic "other act" evidence does not implicate Rule 404(b) of the Federal Rules of Evidence and "consideration of its admissibility pursuant to Rule 404(b) is unnecessary." United States v. Garcia, 27 F.3d 1009, 1014 (5th Cir. 1994).

We agree with the Government that the "other act" evidence at issue is not intrinsic. Indeed, whether Jacobs stole money from Jolt and lied to the IRS is irrelevant to the question of whether Skelton threatened Jacobs, especially given that the Government need not establish a motive for the alleged threat. As the district court correctly recognized, "Let's say all that was true . . . . Does that give your client the right to threaten to kill him?" Because the issue of whether Jacobs committed these other alleged acts is not a requisite preliminary or

9

otherwise necessary to complete the story of the crime charged, we conclude that evidence of these other alleged acts is not admissible as intrinsic "other act" evidence. Coleman, 78 F.3d at 156; Williams, 900 F.2d at 825.

None of the cases cited by Skelton compels a different result. Indeed, in each of these cases, the other act at issue consisted of a crime committed by the defendant that was inextricably intertwined with the offense charged. See, e.g., United States v. Smith, 930 F.2d 1081, 1087 (5th Cir. 1991) (finding no error when district court admitted drug-related testimony regarding defendant); Coleman, 78 F.3d at 156-57 (finding no error when district court admitted evidence that defendant attempted to carjack another vehicle shortly before carjacking victim); United States v. Lamp, 779 F.2d 1088, 1095 (5th Cir. 1986) (finding no error when district court admitted evidence of defendant's drug trafficking offenses to show nature and extent of income in tax fraud case); United States v. Price, 877 F.2d 334, 337 (5th Cir. 1989) (finding no error when district court admitted relevant recordings of conversations in which defendant discussed other crimes he committed). Thus, Skelton has not cited any case in which another act committed by a witness was somehow deemed inextricably intertwined with the offense charged.

The parties next debate whether evidence relating to the allegations that Jacobs stole funds from Jolt and lied to the IRS is admissible under Rules 404(b) and 608(b) of the Federal Rules of Evidence. However, we find both parties to be mistaken in their analysis and conclude that neither Rule applies. The Government first argues that Rule 404(b) bars the admissibility of any evidence relating to the allegations that Jacobs stole funds from Jolt and lied to the IRS. That rule provides:

> Evidence of other crimes, wrongs, or acts is not admissible to prove the character of a person in order to show action in conformity therewith. It may, however, be admissible for other purposes, such as proof of motive, opportunity, intent, preparation, plan,

knowledge, identity, or absence of mistake or accident, provided that upon request by the accused, the prosecution in a criminal case shall provide reasonable notice in advance of trial, or during trial if the court excuses pretrial notice on good cause shown, of the general nature of any such evidence it intends to introduce at trial.

Fed. R. Evid. 404(b).[6] We find that Rule 404(b) does not bar the evidence at issue because it is not being offered as character evidence to show action in conformity therewith. Contrary to the Government's argument, Skelton is not arguing that because Jacobs allegedly stole funds from Jolt and lied to the IRS, he has a propensity to lie generally. Instead, he is offering this evidence to show that Jacobs has a motive to lie about the alleged threat in this case, i.e., to divert attention from his own alleged misdeeds and win favor with the Government. Because Skelton is essentially introducing this evidence as evidence of bias, Rule 404(b) does not bar its admissibility.

Nor does Rule 608(b) apply. That Rule provides, in pertinent part, that "[s]pecific instances of the conduct of a witness, for the purpose of attacking or supporting the witness' character for truthfulness, other than conviction of crime as provided in rule 609, may not be proved by extrinsic evidence." Fed. R. Evid. 608(b). This court has explained that "[t]he application of Rule 608(b) to exclude extrinsic evidence of a witness's conduct is limited to instances where the evidence is introduced to show a witness's general character for truthfulness." United States v. Opager, 589 F.2d 799, 801 (5th Cir. 1979) (emphasis added). This court continued, "[w]e consider Rule 608(b) to be inapplicable in

---

[6] To determine the admissibility of evidence under Rule 404(b), this court employs the two-part Beechum test. United States v. Sumlin, 489 F.3d 683, 690 (5th Cir. 2007) (citing Beechum v. United States, 582 F.2d 898, 911 (5th Cir. 1978) (en banc)). First, the court determines whether the act is relevant to an issue other than character. Beechum, 582 F.2d at 911. This inquiry includes a determination of whether there is sufficient evidence to demonstrate that the witness actually committed the offense. Id. at 912-13. Second, the court determines whether the evidence is admissible under Rule 403 by weighing the probative value of the evidence versus its prejudicial effect. Id. at 913-14; see also United States v. Simmons, 470 F.3d 1115, 1125 (5th Cir. 2006) (internal quotations and citations omitted).

determining the admissibility of relevant evidence introduced to contradict a witness's testimony as to a material issue. So long as otherwise competent, such evidence is admissible." Id. at 802. This court reasoned:

> "We believe that the ultimate purpose of the rules of evidence should not be lost by a rigid, blind application of a single rule of evidence. Individual rules of evidence, in this instance Rule 608(b), should not be read in isolation, when to do so destroys the purpose of ascertaining the truth. This is especially so when a witness directly contradicts the relevant evidence which Rule 608(b) seeks to exclude. . . ." Similarly, we believe that Rule 608(b) should not stand as a bar to the admission of evidence introduced to contradict, and which the jury might find disproves, a witness's testimony as to a material issue of the case.

Id. at 802-03 (quoting United States v. Batts, 558 F.2d 513, 517 (9th Cir. 1977), opinion withdrawn and aff'd on other grounds, 573 F.2d 599 (1978)). Thus, because this evidence is not being offered to establish that Jacobs has a general character for untruthfulness, Rule 608(b) does not bar its admissibility. Moreover, the Supreme Court has held that even if evidence is barred under Rule 608(b), it nonetheless may be admissible if it tends to show bias. United States v. Abel, 469 U.S. 45, 56 (1984); see also United States v. Martinez, 962 F.2d 1161, 1165 (5th Cir. 1992) ("Extrinsic evidence may . . . be admissible for another purpose -- for example, if it tends to show bias in favor of or against a party."). As the Supreme Court explained, "it would be a strange rule of law which held that relevant, competent evidence which tended to show bias on the part of a witness was nonetheless inadmissible because it also tended to show that the witness is a liar [under Rule 608(b)]." Id.

In short, we find that the evidence relating to the allegations that Jacobs stole funds from Jolt and lied to the IRS tends to show that he has a motive to lie in this case and should have been considered and evaluated as evidence of bias. The Supreme Court has recognized that "the exposure of a witness' motivation in testifying is a proper and important function of the

constitutionally protected right to cross examination." Davis, 415 U.S. at 316-17. The Supreme Court has also recognized that "proof of bias is almost always relevant because the jury, as finder of fact and weigher of credibility, has historically been entitled to assess all evidence which might bear on the accuracy and truth of a witness' testimony." Abel, 469 U.S. at 52. In fact, this court has stated that "cross-examination into any motivation or incentive a witness may have for falsifying his testimony must be permitted." United States v. Bratton, 875 F.2d 439, 443 (5th Cir. 1989) (quoting United States v. Hall, 653 F.2d 1002, 1008 (5th Cir. 1981)) (emphasis in original).

The admissibility of bias evidence, however, is subject to Rule 403. Thus, the probative value of admitting such evidence must not be substantially outweighed by any prejudicial effect. Id. In this respect, district courts retain wide discretion in "impos[ing] reasonable limits on defense counsel's inquiry into the potential bias of a prosecution witness, to take into account of such factors as 'harassment, prejudice, confusion of the issues, the witness' safety, or interrogation that [would be] repetitive or only marginally relevant.'" Olden v. Kentucky, 488 U.S. 227, 232 (1988) (quoting Van Arsdall, 475 U.S. at 679); see also United States v. Lamp, 779 F.2d 1088, 1095 (5th Cir. 1986). Within this discretion, however, "[c]ounsel should be allowed great latitude in cross examining a witness regarding his motivation or incentive to falsify testimony, and this is especially so when cross examining an accomplice or a person cooperating with the Government." United States v. Landerman, 109 F.3d 1053, 1063 (5th Cir. 1997) (citing United States v. Hall, 653 F.2d 1002, 1008 (5th Cir. 1981)).

Here, the district court recognized that the evidence at issue is subject to Rule 403 and concluded:

> I will give you [defense counsel] some leeway, but there will not --
> you can preserve your record on other things that you might want

to go into outside the presence of the jury. But we're not going to try Mr. Jacobs. This is Mr. Skelton's trial. Certainly, he is entitled to a fair defense and due process, and I'm going to give him that. But we're not going to try the case of whether Mr. Jacobs did or did not steal money back in the 1990's. You're going to have some limited exploration of that, and then we're going to move on.

At trial, although Skelton was not permitted to introduce extrinsic evidence that Jacobs actually stole money from Jolt and lied to the IRS, he was permitted to explore Jacobs' dealings with Jolt and was specifically permitted to ask if he was only testifying because of the allegations concerning the IRS. He was also permitted to ask Jacobs if he was lying in order to protect himself and whether he had received any assurances from the Government that he would not be prosecuted for his alleged misdeeds. Thus, we conclude that the district court did not err in limiting Skelton's cross-examination because it still gave Skelton ample room to explore the issue of bias. Nor do we find that these limitations give rise to a Confrontation Clause violation given that Skelton was nonetheless "permitted to expose to the jury the facts from which jurors, as the sole triers of fact and credibility, could appropriately draw inferences relating to the reliability of the witness." Restivo, 8 F.3d at 278 (quoting Davis, 415 U.S. at 318). Even if we did find a Confrontation Clause violation, any such error was harmless beyond a reasonable doubt. Indeed, although Jacobs was a key witness, his testimony that Skelton threatened to shoot him was corroborated by Lujan and Skelton was given ample room to explore the issue of bias and otherwise attack the credibility of Jacobs. See Kittelson, 426 F.3d at 319 (citing Van Arsdall, 475 U.S. at 684).

### B. Cross-Examination of Rebuttal Character Witnesses

The second issue raised by Skelton is whether the district court erred in denying him an opportunity to ask specific "did you know" and "have you heard"

questions during cross-examination of the Government's rebuttal character witnesses under Rule 608(b). As quoted in part earlier, that Rule provides:

> Specific instances of the conduct of a witness, for the purpose of attacking or supporting the witness' character for truthfulness, other than conviction of crime as provided in rule 609, may not be proved by extrinsic evidence. They may, however, in the discretion of the court, if probative of truthfulness or untruthfulness, be inquired into on cross-examination of the witness (1) concerning the witness' character for truthfulness or untruthfulness, or (2) concerning the character for truthfulness or untruthfulness of another witness as to which character the witness being cross-examined has testified.

Fed. R. Evid. 608(b). According to this court, Rule 608(b) "permit[s] inquiry on cross examination into specific instances of conduct which may bear on a witness' credibility in order to impeach the credibility of the witness." United States v. Farias-Farias, 925 F.2d 805, 809 (5th Cir. 1991); see also United States v. Tomblin, 46 F.3d 1369, 1389 (5th Cir. 1995) (quoting United States v. Leake, 642 F.2d 715, 718 (4th Cir. 1981) ("Rule 608 authorizes inquiry only into instances of misconduct that are 'clearly probative of truthfulness or untruthfulness,' such as perjury, fraud, swindling, forgery, bribery, and embezzlement."). In order for an alleged bad act to be admissible under Rule 608(b), "[f]irst, the alleged bad act must have a basis in fact and second, the incidents inquired about must be relevant to the character traits at issue in the trial." United States v. Nixon, 777 F.2d 958, 970 (5th Cir. 1985) (citing Michelson v. United States, 335 U.S. 469, 481 n.18 (1948); United States v. Crippen, 570 F.2d 535, 538-39 (5th Cir. 1978)). "That does not mean that the basis in fact must be proved as a fact before a good faith inquiry can be made. Id. (citing United States v. Bright, 588 F.2d 504, 512 (5th Cir. 1979)). The district court has substantial discretion in determining the admissibility of impeachment evidence under Rule 608(b). Farias-Farias, 925 F.2d at 809.

Finally, even if character evidence is deemed admissible under Rule 608(b), its admissibility is subject to Rule 403. Id.; see also United States v. Williams, 822 F.2d 512, 517 (5th Cir. 1987) ("The district court may under Rule 608(b) determine if evidence is probative of truthfulness, and under Rule 403 exclude even probative evidence if the prejudicial effect outweighs the probative value.").

Here, the district court stated that Rule 608(b), when read in conjunction with Rules 404 and 405, applies differently to third-party witnesses, implying that Rule 608(b) somehow bars Skelton from inquiring into specific instances of conduct to test the reliability of the Government's rebuttal character witnesses. In doing so, the district court erred. This court has explained that "[o]nce a witness has testified concerning a defendant's good character, it is permissible during cross-examination to attempt to undermine his credibility by asking him whether he has heard of prior misconduct of the defendant which is inconsistent with the witness' direct testimony." United States v. Wells, 525 F.2d 974, 976 (5th Cir. 1976) (citing Michelson, 335 U.S. at 479); see also Bright, 588 F.2d at 511-12. We see no reason why this Rule would apply differently to rebuttal character witnesses testifying about the character of other third-party witnesses. Indeed, three major treatises on evidence agree that Rule 608(b) permits a party to inquire into specific instances of conduct to test the reliability of a rebuttal character witness in such situations. See 4 Jack B. Weinstein & Margaret A. Berger, Weinstein's Federal Evidence § 608.23, at 68 (2d ed. 2007); 3 Christopher B. Mueller & Laird C. Kirkpatrick, Federal Evidence § 6:41, at 266-68 (3d ed. 2007) ("The propriety of asking such probing questions is settled."); 2 Michael H. Graham, Handbook of Federal Evidence § 608.5, at 622-25 (6th ed. 2006). As the third treatise explained:

> The character witness may be asked not only concerning the specific acts of the principal witness probative of truthfulness or untruthfulness, but may be cross-examined concerning familiarity with convictions as well as arrests, rumors, reports, indictments,

etc., of the principal witness. Such facts have a natural bearing upon the reputation of the principal witness and the character witness' opinion of the principal witness. Lack of familiarity with such facts is relevant to an assessment of the basis for the character witness' testimony. Familiarity with such matters explores the character witness' standard of "truthfulness" or "untruthfulness." Whatever the form of the question, the cross-examiner must, of course, have a good faith basis supporting his inquiry.

Handbook of Federal Evidence § 608.5, at 622-25.

To be clear, we reiterate that Rule 608(b) permits "did you know" or "have you heard" questions regarding specific instances of conduct of the principal witness probative of truthfulness or untruthfulness to impeach the credibility of a rebuttal character witness, subject to Rule 403. Having concluded otherwise, the district court erred. Nonetheless, this court has held that although Rule 608 permits the impeachment of the general credibility of a witness, there is no constitutional right to do so. See Cloud v. Thomas, 627 F.2d 742, 743-44 (5th Cir. 1980). Thus, based on this court's precedent, the district court's error does not implicate the Confrontation Clause.[7]

### C. Jury Instructions and Response to Jury Question

The third and final issue raised by Skelton is whether the district court abused its discretion by denying his proposed jury instruction that in order for the jury to find Skelton guilty, it must find beyond a reasonable doubt that he threatened to shoot Jacobs. When overruling a proposed jury instruction, "[a] court commits reversible error where (1) the requested instruction is

---

[7] Skelton also argues that the district court's evidentiary rulings violated his right to present a complete defense. The Supreme Court has stated that "[w]hether rooted directly in the Due Process Clause of the Fourteenth Amendment or in the Compulsory Process or Confrontation clauses of the Sixth Amendment, the Constitution guarantees criminal defendants a meaningful opportunity to present a complete defense." Holmes v. South Carolina, 547 U.S. 319, 324 (2007) (quoting Crane v. Kentucky, 476 U.S. 683, 690 (1986)). For the same reasons we find no violation of Skelton's confrontation right, we likewise conclude that the district court's evidentiary rulings provided Skelton with a meaningful opportunity to present a complete defense and that any error is harmless beyond a reasonable doubt.

substantially correct; (2) the requested issue is not substantially covered in the charge; and (3) the instruction 'concerns an important point in the trial so that the failure to give it seriously impaired the defendant's ability to effectively present a given defense.'" United States v. John, 309 F.3d 298, 304 (5th Cir. 2002) (quoting United States v. Grissom, 645 F.2d 461, 464 (5th Cir. 1981)).

In discussing the elements of the offense charged in the indictment, the district court instructed the jury that in order to find Skelton guilty, it must find beyond a reasonable doubt "[t]hat the defendant knowingly transmitted a communication containing a threat to injure the person of another, as charged in Count One of the indictment." The district court also gave the following instruction:

> You will note that the indictment charges that the offense was committed on or about a specified date. The government does not have to prove that the crime was committed on that exact date, so long as the government proves beyond a reasonable doubt that the defendant committed the crime on a date reasonably near the date stated in the indictment.

Skelton requested that the district court instead instruct the jury that in order to find him guilty, it must find beyond a reasonable doubt "[t]hat on February 24, 2006, John Skelton knowingly transmitted a telephone communication containing a threat to shoot Terry Lee Jacobs."

Skelton does not dispute that the district court's instructions closely track the Fifth Circuit Pattern Jury Instructions. Nor does he dispute that they constitute a correct statement of the law. Thus, it can hardly be said that the district court abused its discretion in overruling Skelton's proposed jury instruction. See United States v. Turner, 960 F.2d 461, 464 (5th Cir. 1992) (holding that district court did not err in giving instruction that tracked Fifth Circuit Pattern Jury Instructions and was correct statement of law). The thrust of Skelton's argument is that by not giving a specific date and not specifying an

actual threat to shoot in the instructions, the jury could have found Skelton guilty for other alleged threats not charged in the indictment such as his statement in a subsequent phone call, "I'm gonna deal with your [Jacobs'] ass, boy." We reject this argument. The district court's instructions state that in order to find Skelton guilty, the Government must establish beyond a reasonable doubt that Skelton "knowingly transmitted a communication containing a threat to injure the person of another, as charged in Count One of the indictment." (emphasis added). As quoted in the instructions, the indictment states, in pertinent part:

> On or about February 24, 2006 . . . the Defendant, John C. Skelton, knowingly and with intent to extort the sum of $300,000.00 from Terry Lee Jacobs, did transmit in interstate commerce from Arkansas to Texas, a telephone communication to the said Terry Lee Jacobs, which telephone communication contained a threat to injure the person of Terry Lee Jacobs, that is, a threat to shoot him, in violation of Title 18 United States Code, Section 875(b).

(emphasis added). Based on these instructions, we presume that the jury only considered the offense charged in the indictment, which clearly charges Skelton with threatening to shoot Jacobs on or about February 24, 2006. See United States v. Levine, 80 F.3d 129, 136 (5th Cir. 1996) ("The jury is presumed to have followed the court's instructions."). Moreover, Skelton emphasized throughout trial that the Government had to prove that he threatened to shoot Jacobs. Accordingly, Skelton can hardly argue "that the failure to give [the proposed instruction] seriously impaired [his] ability to effectively present a given defense." John, 309 F.3d at 304 (quoting Grissom, 645 F.2d at 464).

Skelton also argues that the district court erred in answering the following jury question, "[a]ccording to 18, U.S.C., Section 875(b), does 'threat to injure a person' mean we have to believe beyond a reasonable doubt that there was a threat to shoot or physical injury in general?" The district court submitted the following response, "you are referred back to the Court's Instructions to the

Jury." Again, those instructions closely track the Fifth Circuit Pattern Jury Instructions, are correct statements of the law, and limited the jury's consideration to the offense charged in the indictment, which specified that the threat at issue was a threat to shoot. Because juries are presumed to follow the district court's instructions and district courts are given wide latitude to respond to jury questions, see United States v. Stevens, 38 F.3d 167, 170 (5th Cir. 1994) (citing United States v. Duvall, 846 F.2d 966, 977 (5th Cir. 1988)), we conclude that the district court did not abuse its discretion in answering the jury question.

## IV. CONCLUSION

For the foregoing reasons, we affirm the district court's judgment of conviction and sentence.

AFFIRMED.